Bruce SPRINGSTEEN, Sweet Summer Night Music, See This House Music, PGP Music, Brockman Music, Cass County Music Company, Kortchmar Music, Red Cloud Music Company, Jeddrah Music, and Night Kitchen Music, Plaintiffs,

v.

PLAZA ROLLER DOME, INC., and Gerald E. Manuel, Defendants,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS, AND PUBLISHERS, Additional Defendant on Counterclaim.

Civ. No. C–84–11–R.

United States District Court, M.D. North Carolina, Rockingham Division.

Jan. 30, 1985.

Michael E. Weddington, Raleigh, N.C., for plaintiffs.

John R. Erwin and David M. Clark, Greensboro, N.C., for Plaza Roller and Manuel.

Michael E. Weddington, Raleigh, N.C., for American Society of Composers, etc.

MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs in this copyright infringement action are ten copyright owners and mem-

bers of the American Society of Composers, Authors, and Publishers ("ASCAP"), seeking monetary damages and injunctive relief against Defendants Plaza Roller Dome, Inc., and Gerald E. Manuel for their allegedly unauthorized transmission via radio and speaker system of Plaintiffs' copyrighted compositions. The unlawful transmissions allegedly were made at the Plaza Putt-Putt golf course in Laurinburg, North Carolina, which is owned and controlled by Defendants. This action arises under the federal copyright laws, 17 U.S.C. § 101 *et seq.* Defendants have filed an answer and counterclaim based on allegations arising from the same transaction. Pending before the court are the parties' cross-motions for summary judgment as to whether Defendants' Putt-Putt course falls within the 17 U.S.C. § 110(5) exemption to the copyright laws. For the reasons set forth below, Defendants' motion for summary judgment will be granted, Plaintiffs' cross-motion for summary judgment will be denied, and Plaintiffs' six causes of action will be dismissed.

### Factual Background

The complex owned and controlled by Defendant Plaza Roller Dome, Inc., consists of an indoor roller rink and an adjacent outdoor miniature golf course and is located at the College Plaza Shopping Center in Laurinburg, North Carolina. Defendant Gerald E. Manuel is the president and principal shareholder of Plaza Roller Dome, Inc. The genesis of the present dispute between the two parties was the October 15, 1980, initialing of a licensing agreement between Defendants and AS-CAP whereby Defendants would be entitled to perform musical compositions by ASCAP's members. The agreement was the result of a long, arduous, and often bitter negotiating process; it provided for ASCAP to settle any and all claims of copyright infringement against the Defendants through October 14, 1980, for the payment of $500.00, and Defendants agreed to pay $300.00 per year for the privilege of performing musical compositions by AS-CAP's members thereafter. Defendants

claim that they understood and were led to believe by ASCAP that the settlement covered both the roller rink and the Putt-Putt course. Plaintiffs disagree, claiming that the agreement does not cover the Putt-Putt course.

Shortly after the October 15, 1980, signing of the licensing agreement, ASCAP, as agent for Plaintiffs, approached Defendants and insisted that the Defendants pay an additional fee in order to license the Putt-Putt course. Defendants contend that Plaintiffs, through their agent ASCAP, were well aware of the scope of the initial agreement, and that ASCAP, on behalf of Plaintiffs, threatened suit and ultimately brought about the institution of this action in order to coerce the Defendants into paying for privileges to which they were already entitled under the 1980 agreement. This course of action was pursued by Plaintiffs and ASCAP, the Defendants contend, to punish them for being tough negotiators in the discussions leading up to the agreement. As a result, when Plaintiffs instituted this litigation, Defendants filed their counterclaim alleging state law causes of action sounding in fraud, deceit, intentional harassment, and unfair trade practices.

The specific infringements complained of by Plaintiffs are alleged to have arisen from the performance, via radio and speaker system, of copyrighted musical compositions at Defendants' Putt-Putt course on August 27, 1983. The radio and speaker system at the Putt-Putt course consists of a radio receiver wired to six separate speakers mounted on light poles interspersed over the 7,500 square foot area of the course. The Defendants contend (and are not controverted by Plaintiffs) that the speakers are very unsophisticated, do not project well, and can be heard without distortion only at a close proximity thereto. They argue that this lack of sophistication, inferior to many home systems, and the limited revenue generated by the Putt-Putt course ($24,308.00 over the six-year period ending July 31, 1983 or slightly over $4,000.00 per year—or less than 3% of the gross revenue of the Plaza Roller Dome)

support their contention that the course is not of sufficient size to justify, as a practical matter, a subscription to a commercial background music system and thus is exempt under Section 110(5).[1]

### Discussion

Section 106(4) of Title 17 of the United States Code grants copyright owners the exclusive rights publicly to perform, or authorize the performance of, their copyrighted works. Pursuant to this provision of the copyright law, Plaintiffs, through ASCAP, received licensing fees from radio stations for the performance of their copyrighted works. Plaintiffs and ASCAP now claim that the "further transmission or performance" of its members' copyrighted works via a radio receiving apparatus "not of a kind commonly used in private homes" by the Plaza Roller Dome and Putt-Putt golf course constitutes copyright infringement. Defendants contend that their use of Plaintiffs' copyrighted materials falls within the 17 U.S.C. § 110(5) exemption to the copyright laws.

The Supreme Court, in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975), created an exemption to the copyright laws for small business establishments, noting that the absence of such an exemption "would result in a regime of copyright law that would be both wholly unenforceable and highly inequitable." *Id.* at 162, 95 S.Ct. at 2047. Specifically, the court held that the owner and operator of a chain of fast-food restaurants in the Pittsburgh area who kept a radio with outlets to four speakers in the ceiling turned on throughout the business day for the enjoyment of the customers and employees in his downtown restaurant was exempt from coverage of the 1909 copyright laws.[2] The size of the particular restaurant in *Aiken* was 1,055 square feet, of which 620 square feet were open to the public; no mention of the revenues of the restaurant was included in the opinion.

In 1976, primarily as a result of this decision, Congress enacted Section 110(5) (17 U.S.C. § 110[5]) to limit the exemption from rights granted copyright owners under Section 106(4).

Section 110(5) exempts from liability:

[C]ommunication of a transmission embodying a performance or display of a work by the public reception of a transmission on a single receiving apparatus of a kind commonly used in private homes, unless—

(A) a direct charge is made to see or hear the transmission; or

(B) the transmission thus received is further transmitted to the public.

The meaning of this statutory language is far from clear, and its reach has scarcely been tested in the courts. Only two reported cases, each involving virtually identical factual situations, have interpreted Section 110(5) and both have relied very heavily on the legislative history in determining whether the exemption applies in a particular factual setting. In *Sailor Music v. Gap Stores, Inc.*, 516 F.Supp. 923 (S.D.N.Y.1981), *aff'd*, 668 F.2d 84 (7th Cir.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982), (hereinafter "the *Gap* case"), the defendant was a well-known chain of approximately 420 clothing stores with annual revenues of nearly $300 million. Plaintiffs, members of ASCAP, brought an infringement action against defendant seeking monetary damages and injunctive relief against every Gap Store in the country. It was Gap's policy to transmit for the enjoyment of its customers radio programs by means of radio receivers connected to recessed loudspeakers arranged so that the music was audible throughout their stores. The allegedly infringing acts occurred at two Gap Stores

---

1. The reference to commercial background music systems is not in the statute, but was indicated to be a key consideration in the legislative history, as discussed *infra*.

2. Both the Supreme Court and court of appeals decisions referred to four speakers in the ceiling of the restaurant. However, the district court opinion stated that there were five separate speakers.

located in New York City—one on Sixth Avenue and the other on Thirty-Fourth Street. In each of the stores the speakers were recessed behind wire grids in the store's ceiling and were connected to the receiver by built-in wiring. There were four speakers at the Sixth Avenue store and seven speakers at the Thirty-Fourth Street store. The two stores had areas of 2,679 and 6,770 [3] square feet, respectively, and the average size of all Gap stores was 3,500 square feet.

In his consideration of whether the Section 110(5) exemption applied to the Gap Stores, Judge Gagliardi quoted at length from the House Judiciary Committee report on the 1976 copyright act. The relevant discussion from the committee report provides:

Under the particular fact situation in the *Aiken* case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt under clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemption, and believes that the line should be drawn at that point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial "sound system" installed or converts a standard home receiving apparatus (by agumenting [sic] it with sophisticated or extensive amplification equipment) into the equivalent of a com-

mercial sound system. Factors to consider in particular cases would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the oral or visual quality of the performance for individual members of the public using those areas.

U.S.Code Cong. & Admin.News 1976, pp. 5659, 5701 (*quoted* by Judge Gagliardi in the *Gap* case, 516 F.Supp. 923, 924–25).

Applying the standard set forth above for the Gap Stores, Judge Gagliardi held that Congress clearly did not intend for stores of that size to fall within the scope of the exemption. The court, noting that the Gap Stores, with an average size of 3,500 square feet, were much larger than the public area of 620 square feet in the fast-food store at issue in *Aiken* (which fact situation the Committee emphasized, was to be "the outer limit" of the Section 110[5] exemption), concluded, by virtue of the size of the Gap Stores, that the radio transmissions received on the radio receivers and played via recessed loudspeakers were "further transmitted to the public," thus placing the stores outside the scope of the exemption.[4]

Judge Gagliardi found further support for his conclusion in the following statement of the Conference Committee Report:

"It is the intent of the conferees that a small commercial establishment of the type involved in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 [95 S.Ct. 2040, 45 L.Ed.2d 84] (1975), which merely augmented a home-type receiver and

---

**3.** Of which only 4,690 square feet consisted of selling area open to the public.

**4.** Further, the court observed, without conclusively deciding the issue, that

the stereo apparatus used by the specified Gap stores, including built-in wiring and four or seven loudspeakers recessed in ceiling cavities, may be considered to be "standard home receiving apparatus [converted] (by augmenting it with sophisticated or expensive amplification equipment) into the equivalent of a

commercial sound system." H.Rep., *supra*, at 87, U.S.Code Cong. & Admin.News 1976, p. 3701.

516 F.Supp. at 925.

Finally, the court held that it could not as a matter of law decide whether or not the particular components used in the two Gap Stores in question were of a type "commonly used in private homes" and declined to grant summary judgment on that basis.

which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt." H.Rep. No. 94–1733, 94th Cong., 2d Sess., 75 (1976), U.S.Code Cong. & Admin.News (1976), p. 5816.

516 F.Supp. at 925. Without specifying whether by size he meant the revenues of the Gap Stores, which totaled over $300 million in 1979, or the average size of each Gap store, which was nearly 3,500 square feet (indoors), Judge Gagliardi held that "[t]he Gap is 'of sufficient size to justify, as a practical matter, a subscription to a commercial background music service.'" The court thus held that Gap was not a small commercial establishment whose reception and performance of radio transmissions via commonly used stereo equipment Congress intended in Section 110(5) to exempt from the category of copyright infringing uses, granted plaintiff's motion for summary judgment, and entered an order enjoining defendant's infringing use of plaintiff's copyrighted works.

The only other reported case which has interpreted the Section 110(5) exemption is *Broadcast Music, Inc. v. United States Shoe Corporation*, 211 U.S.P.Q. 43 (C.D. Cal.1980), *aff'd*, 678 F.2d 816 (9th Cir.1982) (hereinafter *"BMI v. U.S. Shoe"*). *BMI v. U.S. Shoe*, as was mentioned *supra*, presented a factual situation virtually identical to that presented by the *Gap* case. Defendant United States Shoe Corporation owned and operated a chain of more than 600 women's retail apparel stores under the name "Casual Corner." In many of its stores, radio broadcasts were played to the public through the use of a single radio receiver connected to four or more speakers mounted on the store's ceiling. The radio broadcasts included many copyrighted songs. BMI was the licensee of the public performance rights of many of the songs which were played at the facilities without BMI's permission. BMI thus brought suit against United States Shoe Corporation seeking injunctive relief and damages for defendant's unauthorized use of plaintiff's copyrighted materials. De-

fendant in turn contended that it was eligible for the 17 U.S.C. § 110(5) exemption, and both sides submitted cross-motions for summary judgment on that issue.

The Ninth Circuit Court of Appeals upheld the district court's order granting summary judgment in favor of Plaintiffs. The court relied heavily on the Section 110(5) legislative history quoted in the *Gap* case, as well as on Judge Gagliardi's opinion. The court held that the Casual Corner stores exceeded the "outer limit" of the exemption (specified by the House Judiciary Committee to approximate the facts in *Aiken*), because each store had a commercial monaural system, with widely separated speakers of a type not used in private homes, and the size and nature of the operation justified, in the eyes of the court, the use of a commercial background music system. 678 F.2d at 817.

Turning now to the case at bar, there are several significant distinctions between the facts presented in the *Gap* and *BMI v. U.S. Shoe* cases, where the exemption was held not to apply, and the instant litigation. Plaintiffs contend that since the *Aiken* case was intended, according to the House Judiciary Committee Report, to "represent the outer limit of the exemption," and since the Plaza Roller Dome Putt-Putt course is both larger in area and has a greater number of speakers than did the exempted restaurant in *Aiken*, that the exemption clearly should not apply to Defendants' Putt-Putt facility. However, an objective assessment of the facts is much more complex than Plaintiffs' open and shut analysis.

■ It is true, as Plaintiffs contend, that the public area of Defendants' Putt-Putt course is larger (by a factor of 12—7,500 square feet to 620) than that of the restaurant in *Aiken*, and that the Putt-Putt course employed more speakers (six) than did the *Aiken* facility (four). The size of the allegedly offending facility and the number of speakers are not, however, standing alone, the sole or even predominant factors to consider in determining the

applicability of the exemption. According to the House Judiciary Committee Report, "size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the oral or visual quality of the performance" are all factors to consider in determining whether the receiving apparatus has been converted into the equivalent of a "commercial sound system"[5] so as to remove the establishment from the scope of the Section 110(5) exemption.

Applying these factors to Defendants' Putt-Putt course, the argument against applying the Section 110(5) exemption becomes much less persuasive. To begin with, ASCAP's own field representative described the sound system at Defendants' Putt-Putt facility as follows:

> [S]ix speakers, attached to white posts that also provide lighting for evening Putt-Putt are equidistantly spread throughout the course. *The speakers did not project very well and one needed to be in a close proximity to the speaker to hear without much distortion.*

Brief in Support of Defendants' Motion for Summary Judgment—Exhibit A (emphasis added).

Clearly, the noise level and audibility of songs transmitted over Defendants' loudspeakers, by Plaintiffs' own admission, is not comparable to the sound systems in the *Gap* case and *BMI v. U.S. Shoe*, and does not rise to the level or minimum quality requisite for a commercial sound system. Unlike the systems involved in those two cases, where the infringing performances were audible throughout the stores and the speakers improved the quality of the performance, the allegedy infringing performances at Defendants' Putt-Putt course were scarcely audible without distortion

even at very close proximity to the speakers. Under such circumstances, the speakers could scarcely be said to have "improved the quality of the performance." Indeed, the poor quality of speakers and the outdoor nature of the course guaranteed that the quality of sound performed for customers at Defendants' course would be lower than that which was performed for customers in the Gap and Casual Corner stores. Moreover, with respect to audibility and lack of improvement in the quality of the performance via augmentation, the receiving apparatus and speakers at Defendants' Putt-Putt course are inferior to those involved in the *Aiken* case. Hence, when all relevant factors have been taken into account, including those set out in the House Judiciary Committee Report, Defendants' sound system does not exceed the outer limit of the exemption as specified by the fact situation in *Aiken* and should therefore be entitled to the exemption to the copyright laws pursuant to Section 110(5).

This conclusion is reinforced by the language of the Conference Committee Report, incorporated into the legislative history subsequent to the House Judiciary Committee Report, which stated that a small commercial establishment of the type involved in *Aiken* which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background service, would be exempt. The courts in the *Gap* and *BMI v. U.S. Shoe* cases held that operations with 420 and 600 prosperous retail outlets, respectively, both of which did hundreds of millions of dollars of business annually, were not within the purview of the Section 110(5) exemption. This court does not contest the soundness of those opinions. However, if any operation is "not of sufficient size to justify, as a practical matter, a subscription to a com-

---

**5.** Whether or not a system has been transformed into the equivalent of a commercial sound system is a significant test in the legislative history because, inferentially, Congress apparently concluded that a receiving apparatus is

"not of a kind commonly used in private homes" precisely when it has been transformed into the equivalent of a commercial sound system.

mercial background music service," it is Defendants' Putt-Putt course.[6]

The restaurant involved in the *Aiken* case was a fast-food restaurant in Pittsburgh which operated year-round, did a brisk business, and undoubtedly generated substantial revenues. It was one of a chain of restaurants in the area. Defendants' Putt-Putt course, by contrast, is open for only roughly six months per year and rarely if ever generates over $1,000.00 per month.[7] Writing in the New York Law School Law Review, Mr. Bernard Korman, general counsel for ASCAP, correctly described the congressionally-mandated scope of the Section 110(5) exemption as follows: "it [is] a very limited exemption which ... require[s] any establishment large enough to be a potential customer of a background music service to obtain a license if it chooses to perform music broadcast by any radio station." Korman, *Performance Rights in Music under Sections 110 and 118 of the 1976 Copyright Act*, 22 N.Y.L.Sch.L.Rev. 521, 534 (1977).

Based on all of the factors analyzed above, this court must conclude that the Plaza Roller Dome Putt-Putt course is not of sufficient size to justify a subscription to a commercial background music service and therefore is within the scope of the Section 110(5) exemption. When due weight is given to each of the factors mentioned by Congress in determining the applicability of the exemption, the size of the course and the slightly larger number of speakers involved in the instant case vis-a-vis *Aiken*, standing alone, do not alter this conclusion.

Consequently, Defendants' motion for summary judgment will be granted and Plaintiffs' motion for partial summary judgment will be denied.

A judgment will be entered in accordance with this Memorandum Opinion.

---

6. The Putt-Putt course is, of course, only a part of a larger operation which may be of sufficient size to justify a subscription to a commercial music system, *i.e.*, the Plaza Roller Dome complex which includes Defendants' licensed roller rink. However, since Plaintiffs seek to treat the Putt-Putt course separately for purposes of licensing, this court will likewise treat the course as analytically separate for the purpose of applying the Section 110(5) exemption.

7. Over the six-year period from July 1977 through July 1983, Defendants' Putt-Putt course never generated revenues in excess of $5,700.00 in any six-month period.