Dorothy **RODGERS, et al., Plaintiffs,**

v.

**EIGHTY FOUR LUMBER COMPANY, Defendant.**

**JONICO MUSIC, et al., Plaintiffs,**

v.

**EIGHTY FOUR LUMBER COMPANY, Defendant.**

**HARRISON MUSIC CENTER, et al., Plaintiffs,**

v.

**EIGHTY FOUR LUMBER COMPANY, Defendant.**

**Civ. A. Nos. 84–828, 84–1114 and 84–1944.**

United States District Court, W.D. Pennsylvania.

Dec. 11, 1985.

---

890

Kevin C. Abbott, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiffs.

Daniel J. Weis, Pittsburgh, Pa., for defendant.

## FINDINGS AND CONCLUSIONS

GERALD J. WEBER, District Judge.

These are three consolidated actions by registered holders of copyrights to musical compositions. All are members of ASCAP (American Society of Composers, Authors and Publishers) which has the right to license performance of members copyrighted compositions. We have previously granted summary judgment to plaintiffs based on 49 counts of specific copyright infringement occurring in defendant's stores in various states from prior to February 1, 1983 through June 7, 1984.

We have now held an evidentiary hearing on damages. Plaintiff has elected to claim statutory damages for each count in lieu of actual damages and profits under 17 U.S.C. § 504(c)(1). The court has the discretion to award between $250 and $10,000 for each infringement, but if the infringement is willful the court may increase the award to $50,000 for each cause of action. The plaintiff alleges that these infringements were willful. (17 U.S.C. § 504(c)(2)). Because the violations have been established, the court will confine itself to the evidence of willfulness.

■ Defendant utilized the same system of transmitting broadcast music throughout its nationwide chain of more than 360 stores as a matter of corporate policy. Defendant corporation is therefore liable for the infringing activities of its employees in carrying out this policy. *Gershwin Publishing Corp. v. Columbia Artists Management Inc.,* 443 F.2d 1159 (2d Cir.

1971). The corporate headquarters of defendant purchased the equipment centrally. This equipment included a radio receiver, an amplifier, and multiple speakers distributed throughout the large interior premises (from 10,000 to 25,000 square feet). The music thus performed could be heard and the individual compositions played could be heard and recognized throughout the stores that are the subject matter of the specific counts here.

Beginning on February 1, 1983 defendant was notified by letter of ASCAP that its use of music in this fashion violated the copyright laws and offering a license arrangement. There were five such letters through August 9, 1983, and in addition attempts to contact defendant's officers by telephone and visits. No response to these communications was received. On September 1, 1983, a certified letter was sent to defendant's president and produced a response on September 9, 1983 that defendant was considering music options. A further letter from defendant dated October 21, 1983 promised to provide ASCAP a list of its stores using music. In the meantime defendant continued its policy of playing broadcast music through loudspeakers in its stores.

A meeting was finally held on November 17, 1983 between ASCAP representatives and defendant's officers. Based on defendant's list it was established that 362 stores were involved. ASCAP demanded a standard annual license fee of $200 per store for the first 200 stores and $90 per store for those above 200, or a total of $34,580. Defendant made an attempt to bargain but ASCAP insisted that it could not bargain on the license fee because of the restrictions of an anti-trust consent decree to which it was a party. It was proposed that defendant should sign a license agreement for $34,580 per annum beginning July 1, 1983, with a payment of $25,935 forthwith, representing fees through March 31, 1984. A form of agreement was forwarded to defendant at that time, and further requests were made by ASCAP by letter and phone without results.

ASCAP not only warned defendant of the continuing copyright infringements, but also sent pamphlets explaining the copyright laws. This was not necessary because the defendant had in-house counsel available at its headquarter office.

Defendant argues that it made no direct profit from playing the music in its stores, that it was not audible outside the stores to attract customers into the stores from the street, nor would passers-by be attracted because of the isolated locations of the stores. The music served as background music, mood music, or "white sound" of which the customer was not specifically conscious. However, the value of such music to its business was apparent to defendant, as evidenced by its investment in this equipment for all its stores. More telling is the evidence that during the period of these negotiations, defendant secured offers from several purveyors of background music, such as MUZAK, to provide such services. The costs, which would include royalty fees to copyright owners, were considerably greater than the license fee demanded by ASCAP.

Plaintiffs continued to gather evidence of violations during 1984. The first of the three complaints was filed April 3, 1984 based on 10 infringements, the second was filed May 7, 1984 citing 18 infringements, the third was filed on August 13, 1984 citing 21 infringements. Despite defendant's denial in its answers of currently playing music in any of its stores, plaintiff continued to collect evidence of current infringements up through April 12, 1985.

Defendant's evidence in defense attempts to show that its headquarters was investigating this matter, attempting to stop the practice, and attempting to negotiate a license fee. Executive directives were issued in January 1984 to all stores in the Pittsburgh area, in April 1984 to all stores nationally. In the face of continuing evidence of violations, all stores were inspected in the summer of 1984, and further all equipment was ordered returned to defendant's headquarters. This was allegedly completed in February 1985, but plain-

tiff has presented unrefuted evidence of violations in Yuma, Arizona on April 11 and 12, 1985. Plaintiff disclaims corporate responsibility for isolated violations after its attempt to stop the practice in 1984, particularly because it is not shown that it received any pecuniary benefit to itself from these infringements. However, we have previously noted that defendant considered the playing of background music to be advantageous to its business. The wide-spread use of background music in business establishments convinces us that it is beneficial to business generally. *Chappell & Co. v. Middletown Farmers Market & Auction Co.*, 334 F.2d 303 (3d Cir.1964) holds that "Though this was not of direct pecuniary benefit, it was 'for profit' to the degree that it was commercially beneficial to the Mart to have an attractive shopping atmosphere." (p. 306).

We find the evidence supports the conclusions that the infringements were deliberate and wilful; they continued after many warnings and showings of specific proofs; they continued after specific denials that any music was currently being played. Finally, we find that defendant avoided responses to many notices and did not negotiate for a license in good faith.

The courts have applied many standards as a guideline in the imposition of statutory damages. Running through them as a common thread is the principle that defendant should not reap a benefit from its violation of the copyright laws, that statutory damages should exceed the unpaid license fees "so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them." *Music City Music v. Alfa Foods, Ltd.* 616 F.Supp. 1001, 1003 (E.D.Va.1985). Furthermore, they serve the strong public interest in insuring integrity of copyright laws. (*ibid*, p. 1004).

The actual damages here proven are the amount of royalties that plaintiffs lost; the benefit to defendant is the amount of royalties that it has not paid. Plaintiff has argued for an assessment of damages of $2,500 per violation for each of the 49

infringements proven here. The total of these $122,500 substantially exceeds plaintiffs' claim of lost license revenues of $77,-805 between the period from February 1, 1983 and April 12, 1985 and should serve as a proper deterrent for such illegal practice. We are mindful that plaintiffs are also entitled to attorney's fees and costs, which will be assessed later.

We will, therefore, assess damages in favor of the individual plaintiffs as set forth in the accompanying judgment order in the amount of $2,500 for each infringement for a total sum of $122,500 against the defendant in these consolidated actions.

## ORDER OF COURT

AND NOW, this 11 day of December, 1985, after trial on the issue of damages and in accordance with the accompanying findings, IT IS ORDERED that:

1. JUDGMENT be, and the same is ENTERED for the Plaintiffs in Civil Action No. 84–828 against Defendant in the amount of $25,000 based on ten violations at $2,500 per violation.

2. JUDGMENT be, and the same is ENTERED for the Plaintiffs in Civil Action No. 84–1114 and against the Defendant in the amount of $45,000 based on eighteen violations at $2,500 per violation.

3. JUDGMENT be and is ENTERED for the plaintiff in Civil Action No. 84–1944 and against the Defendant in the amount of $52,500 based on twenty-one violations at $2,500 per violation, with costs in each action.

4. JUDGMENT in the total amount of $122,500 BE, AND THE SAME IS HEREBY ENTERED against the defendant and in favor of the plaintiffs representing damages as set forth above.

5. Plaintiffs are hereby awarded costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505. Counsel for plaintiffs will file a statement of fees and costs within twenty (20) days of this Order.

6. The defendant and all persons acting under the direction, control, permission or

license of the defendant be, and they hereby are, permanently enjoined and restrained from publicly performing and broadcasting the works set forth in the Complaints and from causing or permitting said works to be publicly performed and broadcasted in the defendant's premises or in any place owned, controlled or conducted by the defendant.

IT IS SO ORDERED.