**INTERNATIONAL KORWIN CORP., et al., Plaintiffs,**

**v.**

**Tadeusz KOWALCZYK, Defendant.**

**No. 84 C 3455.**

United States District Court, N.D. Illinois, E.D.

July 1, 1987.

654

Dennis C. Waldon, Monica L. Thompson, Keck Mahin Cate, Michael J. Allen, Chicago, Ill., for plaintiffs.

James A. Brow, Chicago, Ill., Sidney Sherman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiffs, International Korwin Corp., Famous Music Corporation, Northern Mu-

sic Company, Prophet Music, Inc., Chappell & Co., Inc., Northridge Music Company, and Warner Brothers, Inc., brought this copyright infringement action against defendant, Tadeusz Kowalczyk, pursuant to the Copyright Act of 1976 (Act), 17 U.S.C. § 101 *et seq.* Plaintiffs alleged defendant infringed plaintiffs' copyrights in seven musical compositions by publicly performing the compositions without the permission of plaintiffs or plaintiffs' representatives. Plaintiffs moved for summary judgment, but based on representations made by the defendant and the defendant's musicians the motion was denied. *See* Minute Order of October 22, 1985. As a result, a bench trial was held on March 24–25, 1987 from which the court makes the following Findings of Fact and Conclusions of Law.

## I. *Findings of Fact*

Each plaintiff is the owner of the valid copyright of one or more of the following musical compositions: "Chances Are"; "Tangerine"; "Speak Softly Love (a/k/a Love Theme From The Godfather)"; "Charade"; "Play Me"; "Bewitched"; and "Dear Heart."

Plaintiffs are members of the American Society of Composers, Authors, and Publishers (ASCAP). ASCAP holds a nonexclusive right to license the public performance of the plaintiffs' musical compositions.

Defendant, Tadeusz Kowalczyk, is the sole owner of the Orbit Restaurant (the Orbit). The Orbit, located at 294854 Milwaukee Ave. in Chicago, Illinois, is an establishment open to the public which serves food and liquor to its patrons.

The Orbit contains 2664 square feet of space open to the public. The area is divided into a coffee shop, small dining room, and a bar area. In total, the Orbit seats approximately 200 persons.

It is defendant's policy to provide musical entertainment at the Orbit. The music consists of live performances and retransmissions of radio broadcasts.

The live musicians—a violinist, Gustav Kaminski (Kaminski), and an organist, Zygmunt Piontek (Piontek),—perform three nights a week. They are not defendant's employees, but are solely compensated by tips from the Orbit's patrons. The radio is on during all other business hours, including during the intermissions of the live performances.

The radio broadcasts, consisting primarily of the radio station "FM 100," are received at the Orbit by a Grommes radio receiver. The receiver, located in defendant's private office, is connected via concealed speaker wire to eight speakers. Each speaker is mounted in the restaurant's ceiling and covered with a grill. The speakers are located outside the private office and are dispersed throughout the public areas of the Orbit. The speakers are not within a narrow circumference of the receiver.

Defendant's receiver has paging capabilities and possesses three sets of speaker terminals: 8 ohms, 25 volts, and 70 volts. The receiver is capable of driving up to 40 speakers.

Plaintiffs' presented an expert, Daniel E. Hart, who evaluated the Grommes receiver. In Hart's opinion, which the court finds credible, the receiver was not of a type commonly used in private homes.

According to the defendant's tax returns, from 1980 to 1985 the Orbit had annual gross revenues ranging from $583,000 to $919,000 creating a net profit of $35,000 to $136,000. The Orbit has sufficient space and generates enough revenue to justify the use of a commercial background music service.

On August 21, 1983, defendant publicly performed plaintiffs' seven musical compositions at the Orbit. Piontek and Kaminski performed "Speak Softly Love," and the remaining six were performed by means of defendant's Grommes receiver and ceiling speakers. Defendant did not have an ASCAP license or the individual copyright owners' permission to perform publicly these songs.

Before plaintiffs commenced this action, ASCAP contacted defendant on numerous occasions. The contacts, as evidenced by the ASCAP District Office file, included letters, phone calls, and personal visits to

the Orbit spread over a three year period. *See* Plaintiffs' Exhibits 1–26. In the course of these contacts, ASCAP offered defendant an ASCAP license to perform the AS-CAP repertoire. ASCAP also informed defendant that the public performance of copyrighted musical compositions without an ASCAP license or the copyright owner's permission constitutes copyright infringement in violation of federal law. In response to ASCAP's inquiries defendant vowed never to join ASCAP and told ASCAP representatives to sue him.[1]

Had defendant purchased an ASCAP license from the date of ASCAP's first contact to the present, the total license fees would have amounted to $3,555.00.

Based upon defendant's testimony it is likely that he will continue to perform plaintiffs' and other ASCAP members' music at the Orbit.

## II. *Conclusions of Law*

### A. *Live Performance*

Section 106(4) of the Act grants copyright owners the exclusive right to publicly perform or authorize the performance of their copyrighted works. The Act broadly defines "perform" to include the rendition or playing of a work "either directly or by means of any device or process." 17 U.S.C. § 101. To perform "publicly" means to perform at a place open to the public. *Id.*

■ Applying these rules to the case at bar, on August 21, 1983, Piontek and Kaminski publicly performed the copyrighted song "Speak Softly Love (a/k/a Love Theme From The Godfather)" at the Orbit. Neither the musicians nor the defendant had obtained a copyright license to perform the work. Thus, the performance constitutes a copyright infringement.

■ Defendant is responsible for the infringement even though he did not employ the musicians. The Act holds a proprietor responsible for the copyright infringement of musicians, itinerant or otherwise, which

the proprietor allows to perform in his establishment. *See Famous Music Corp. v. Bay State Harness Horse Racing and Breeding Association, Inc.,* 554 F.2d 1213, 1214–15 (1st Cir.1977); *Broadcast Music, Inc. v. Niro's Palace, Inc.,* 619 F.Supp. 958, 961 (N.D.Ill.1985); *Cass County Music Co. v. Vineyard Country Golf Corp.,* 605 F.Supp. 1536, 1537 (D.Mass.1985). This is true even if the proprietor instructed the group to avoid playing protected works, or was unaware that the works played were copyrighted. *E.g. Cass County Music Co. v. Kobasic,* 635 F.Supp. 7, 9 (W.D.Mich. 1984); *Chess Music, Inc. v. Sipe,* 442 F.Supp. 1184, 1185 (D.Minn.1977).

Hence, defendant has violated plaintiffs' exclusive copyrights under the Act by permitting the musicians to perform "Speak Softly Love," a copyrighted work, without proper license to do so.

### B. *Radio Performances*

On August 21, 1983, at the Orbit, defendant performed the remaining six songs by means of his radio system. Defendant asserts that the performances did not violate the plaintiffs' exclusive rights because section 110(5) of the Act exempts defendant from liability.

Section 110(5) provides, in part, that notwithstanding the otherwise exclusive rights vested in the copyright owner:

> communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes [is not a copyright infringement] unless—
>
> (A) a direct charge is made to see or hear the transmission; or
>
> (B) the transmission thus received is further transmitted to the public.

■ When interpreting a federal statute a court must first look to the express statutory language, and only then to the legislative history where the statute is ambigu-

---

1. Defendant denied ever being contacted by AS-CAP. Yet, given the volume of the contacts, ASCAP's explicit documentation, and defend-

ant's other inconsistent testimony, defendant's denials are not credible.

ous. *E.g., Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984). Applying that well settled rule of interpretation in the instant case, the court finds three independent bases for denying defendant a § 110(5) exemption.

### 1. *Commonly Used in Private Homes*

■ To qualify under § 110(5), a performance must, first, be rendered by a "single receiving apparatus of a kind commonly used in private homes." In the instant case, Hart's uncontroverted expert testimony demonstrates that defendant's Grommes receiver, with features and power typical of a commercial receiver, is clearly *not* the type of receiver commonly used in the home. In addition, the commercial style receiver is attached via built-in concealed wiring to eight remote ceiling mounted speakers; hardly the type of sound system *commonly* found at home, even in today's high-tech world. Accordingly, applying the plain language of the statute, defendant fails to satisfy the exemption.

Moreover, the legislative history supports this conclusion. Both the sponsoring committee and the conference committee reports emphasize that Congress enacted § 110(5) with the facts of *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975), in mind. *See* H.R. No. 94–1476, 94th Cong.2d Sess. 87 (1976), *reprinted in,* 1976 U.S.Code Cong. & Admin.News 5659, 5701 (House Committee); H.R. No. 94–1733 94th Cong.2d Sess. 75 (1976), *reprinted in,* 1976 U.S.Code Cong. & Admin.News 5816 (Conference Report). In *Aiken* the Court exempted from complying with the 1909 Copyright Act a 620 square foot fast-food store which was rebroadcasting radio programs by means of a home style radio and four speakers. Congress, in discussing what type of receiving apparatus it sought to exempt, stated it viewed *Aiken's* home receiver with "four ordinary loud speakers grouped within a relatively narrow circumference from the set" as the "outer limit" of protected sound systems. 1976 U.S. Code Cong. & Admin.News at 5701. Defendant's powerful receiving apparatus easily exceeds that limit, and is more akin to a commercial sound system augmented for the purpose of improving the aural quality of the performance. *Id.; accord Rodgers v. Eighty Four Lumber Co.,* 617 F.Supp. 1021, 1023 (W.D.Pa.1985); *Sailor Music v. Gap Stores, Inc.,* 516 F.Supp. 923, 925 (S.D.N.Y.), *aff'd,* 668 F.2d 84 (2d Cir. 1981), *cert. denied,* 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Laminations Music v. P & X Markets, Inc.,* 1985 Copyright L. Dec. ¶ 25,790, at 19,557 (N.D.Cal. 1985).

Therefore, the court finds defendant performed plaintiffs' musical compositions on a single receiving apparatus of a kind not commonly used in private homes. Hence, defendant's performances are not exempt under § 110(5).

### 2. *Further Transmitted to the Public*

■ Even assuming defendant used an apparatus of a kind commonly used in private homes, if defendant's performances were "further transmitted to the public," defendant would not be entitled to a § 110(5) exemption. 17 U.S.C. § 110(5)(B).

As defined in the Act, "to 'transmit' a performance … is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. In the instant case, the physical layout of the Orbit and the positioning of defendant's receiving apparatus is decisive. The performances originated in defendant's private office which is located at one end of the Orbit and is completely separate from the public dining areas. Then, by concealed wiring, the defendant sent the broadcasts from his office to the Orbit's coffee shop, dining room, and bar where the patrons heard the music. This is sufficient to constitute "further transmission" under the Act. *See Hampshire House Publishing Corp. v. Sal and Sam's Restaurant, Inc.,* No. 84–1296, slip. op. at 2 (E.D.La. Jan. 11, 1985) [Available on WESTLAW, DCT database]; *Rodgers,* 617 F.Supp. at 1022 n. 1; *Gap Stores,* 516 F.Supp. at 923.

Therefore, the court finds defendant does not qualify for the § 110(5) exemption because he rendered performances which were further transmitted to the public.

### 3. *Small Commercial Establishment*

■ Defendant also fails to qualify under § 110(5) because the Orbit is not the type of small commercial establishment protected by the exemption. As the Conference Report explained,

> it is the intent of the conferees that a small commercial establishment of the type involved in *Aiken,* which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt.

1976 U.S.Code Cong. & Admin.News at 5816. With 2,640 square feet of space, the Orbit is more than four times the size of the small fastfood store in *Aiken* and hence too large an establishment to qualify under § 110(5). *See Gap Stores,* 516 F.Supp. at 925. In addition, defendant used eight speakers which were dispersed throughout the Orbit; twice the number found in *Aiken* where the speakers narrowly circumscribed the receiver. *See St. Nicholas Music, Inc. v. D.V.W., Inc.,* No. 84–0307W, slip op. at 2–3 (D.Utah Feb. 15, 1985); *Laminations,* 1985 Copyr.L.Dec. at 19,556–57. Further, given both its physical size and substantial revenues, the Orbit is a large enough establishment to accomodate a background music service. *See also BMI,* 678 F.2d at 817.[2]

In sum, defendant is not the type of small commercial establishment Congress sought to exempt from the Act pursuant to § 110(5). Hence, defendant is liable for copyright infringement.

### C. *Remedy*

### 1. *Injunctive Relief*

■ The Act empowers this court to grant "injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Defendant's infringing activities have continued for an extended period of time. Moreover, given defendant's testimony, it is likely, absent a court order, that defendant would continue to infringe plaintiffs' copyrights. Hence, defendant is permanently enjoined from publicly performing or sponsoring the public performance of plaintiffs' musical compositions listed herein until such time as defendant obtains a license to do so. *E.g. Pacific and Southern Co., Inc. v. Duncan,* 744 F.2d 1490, 1499–1500 (11th Cir.1984); *Lauratex Textile Corp. v. Allton Knitting Mills, Inc.,* 519 F.Supp. 730, 732 (S.D.N.Y.1981).

### 2. *Statutory Damages*

As provided by the Act, plaintiffs have elected to recover an award of statutory damages in lieu of actual damages and lost profits. In general, when a plaintiff elects to recover statutory damages, the court will award plaintiff between $250 and $10,000 for each work infringed upon by the defendant. 17 U.S.C. § 504(c)(1). If the infringement was willful, however, the court has the discretion to increase the award to up to $50,000 per work. *Id.* at § 504(c)(2). Conversely, if the infringer proves he had no reason to believe his acts constituted copyright infringement, the court may reduce the award to no less than $100 per work. *Id.*

■ To determine the amount of statutory damages the court should primarily focus upon two factors: the willfullness of the defendant's conduct, and the deterrent value of the sanction imposed. Although the restitution of wrongfully acquired gain

---

**2.** Defendant's reliance on *Springsteen v. Plaza Roller Dome, Inc.,* 602 F.Supp. 1113 (N.D.N.C. 1985) (exemption granted to miniature golf course) is misplaced. In contrast to the Orbit, the miniature golf course in *Springsteen* was indeed a small business as the course generated only $4,000 in revenues each year. *Id.* at 1114. In addition, the course employed an unsophisticated sound system—inferior to many home systems—which was scarcely audible without distortion even at a very close proximity to the speakers. *Id.* at 1119. While it is true the noise at the bar sometimes made it difficult for bar patrons to hear the Orbit's sound system, the vast majority of the patrons were able to enjoy to music. Moreover, the Orbit's system successfully served as background music,—creating an atmosphere and muffling unpleasant noises—precisely the type of performance which is not exempted under the Act.

and reparation for actual damage is surely relevant, it is often, as in the case at bar, difficult if not impossible to put a dollar figure on the actual damages incurred as a result of the defendant's actions. Accordingly, the statute itself clearly distinguishes between willful and unknowing violations. Moreover, courts have repeatedly emphasized that defendants must not be able to sneer in the face of copyright owners and copyright laws. Rather, defendants must "be put on notice that it costs less to obey the copyright laws than to violate them." *Music City Music v. Alfa Foods, Ltd.*, 616 F.Supp. 1001, 1003 (E.D. Va.1985); *see also F.W. Woolworth v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952); *Rodgers v. Eighty Four Lumber Co.*, 623 F.Supp. 889, 892 (W.D.Pa.1985).

In the present case, defendant violated the copyright laws despite ASCAP's repeated efforts—by letter, telephone, and personal visits—to license defendant's establishment. Defendant's initial refusal may have come from ignorance of the intricacies of copyright law. However, defendant certainly came to understand his obligations under the law. Yet, his answer, time and time again, was essentially—"Sue me. I am never going to join." Given this cavalier attitude, the defendant's infringing conduct can only be described as willful.

Had defendant purchased an ASCAP license he would have paid approximately $3,500 for the right to play the ASCAP repertoire. In order to ensure defendant did not profit from violating the copyright laws, and to vindicate the integrity of those laws, the court orders defendant to pay plaintiffs $1,500 in statutory damages for each act of infringement. As defendant committed seven infringing acts, defendant hereby is ordered to pay $10,500 in statutory damages.

### 3. Attorneys' Fees

The Act grants the trial court the discretion to award costs and "a reasonable attorney's fee to the prevailing party ..." 17 U.S.C. § 505. Fees are particularly appropriate when the defendant willfully committed copyright infringement. *See Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir.1983); *Niro's Palace*, 619 F.Supp. at 964.

Unquestionably, plaintiffs are prevailing parties. Moreover, as discussed *supra*, defendant willfully infringed plaintiffs' copyrights. Defendant contends, however, that he should not be assessed fees because he had a good faith claim that he fell within the § 110(5) exemption up until the plaintiffs withdrew the stipulation that the Grommes receiver was "of a type commonly used in a private home."

Yet, even had the stipulation remained in effect, given the remaining uncontroverted evidence concerning the size of the Orbit, its annual revenues, the number of speakers, and the location of the speakers, defendant still would not have had a credible, good faith basis for asserting the exemption. To the contrary, it is clear that had the defendant accurately presented the facts, the case could have been resolved at summary judgment.[3] Therefore, given the defendant's willful infringement and the lack of any good faith basis for asserting a defense, the court hereby awards reasonable attorney's fees to the plaintiffs.

A court determines a "reasonable" attorneys' fee by multiplying the number of hours reasonably expended by a reasonable hourly rate. *See e.g. Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Hours are not reasonably expended if they are excessive, redundant, or otherwise inconsistent with appropriate billing practices. *Id.* at 434, 103 S.Ct. at 1939–40.

---

**3.** Defendant's deposition, and Piontek and Kaminski's affidavits were instrumental in the court's decision to deny plaintiffs' motion for summary judgment. *See* Minute Order of October 22, 1985. Defendant had stated in his deposition that the Orbit only had four speakers, thereby seriously calling the *Aiken* "outer limit" into play, and Piontek and Kaminski each denied playing plaintiffs' music. Yet, these facts were not borne out at trial as defendant admitted that the Orbit has eight working speakers, and without any explanation, failed to produce either Kaminski or Piontek.

Plaintiffs' counsel has filed a 23 page fee petition itemizing the costs and fees it incurred in litigating this action. Defendant's counsel, by only responding in a very general fashion and without detailing where the court should pare this voluminous request, has effectively thrown up their hands and left this arduous task for the court. Such advocacy is highly suspect. Nonetheless, the court has carefully scrutinized plaintiffs' petition and finds several instances in which the petition is excessive and must be reduced.

First, while on the whole the petition is detailed, it contains numerous references to "review of file"; "conference with"; "organized file"; "revising billing"; and "various telephone conferences with _____." The court finds charging a client for these rather vague listings or listings attributable to general overhead as inconsistent with appropriate billing practices. Hence, the time requested is reduced as follows: MLT–3.75, PKW–3.25, MJA–1.75, CNH–10.25; JM–7.75.[4]

Moreover, the petition seeks approximately 5.0 hours of paralegal time and 2.5 hours of attorney time for a brief request to admit. That is excessive and thus reduced—CNH–3.5 hours; MLT–2.0 hours—to a total of 2.0 hours.

Further, plaintiffs billed 18.25 hours for preparing a motion for summary judgment. This is excessive given that the motion itself involved little substantive analysis and no legal research, but simply compiled proof of copyright ownership and attached brief affidavits evidencing the infringement. Therefore, the court strikes 13.25 hours of time attributed to CNH.

Similarly, plaintiffs' counsel attributed 14.8 hours of attorney time and 2.0 hours of paralegal time to its reply brief on the summary judgment motion. This is unduly excessive for a relatively straightforward, six page responsive brief. Thus, the court strikes 9.8 hours of attorney time and the two hours of paralegal time and

thereby reduces plaintiffs' request to: PKW–5.0 hours.

Plaintiffs prepared a fee affidavit as a supplement to its summary judgment motion. That work was premature as the court had made no ruling in plaintiffs' favor. Accordingly, the time spent—JM–4.25; PKW–1.45—is stricken.

Plaintiffs also requested more than 50 hours of attorney time for work entitled "trial preparation" without detailing the nature of the work involved. Without more precise representations, particularly given the brevity of the trial and the few witnesses involved, the court reduces the request by 15 hours; MLT–9.0 hours and MJA–6.0 hours.

The petition also includes approximately 5.0 hours for legal research covering the conclusions of law. As the research was surely gathered during the preparation of the plaintiffs' pre-trial brief (absolutely no new cases were cited), the additional research was essentially redundant. Hence, 4.25 hours, attributed to MJA, are stricken.

Accordingly, taking the remaining hours and the plaintiffs' corresponding billing rates the court awards plaintiffs a reasonable attorney's fee of $21,502.75 and costs of $1,693.88, and orders the defendant to pay the same.

### III. *Conclusion*

For the reasons stated in this opinion, the court enters judgment for the plaintiffs in the amount of $33,696.63. Defendant is also permanently enjoined from publicly performing or sponsoring the public performance of plaintiffs' musical compositions listed herein until such time as defendant obtains a license to do so.

---

**4.** The court will refer to the plaintiffs' attorneys and paralegals by the initials used in plaintiffs' fee petition.