In the Matter of Russell E. SINCLAIR, Sr. and M. Marguerite Sinclair, Debtors–Appellants.

No. 89–1093.

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 18, 1989.*

Decided March 28, 1989.

---

* An earlier appeal was argued on November 1, 1988, and dismissed for want of appellate jurisdiction on November 17, 863 F.2d 885. The district judge then certified the case for an interlocutory appeal under 28 U.S.C. § 1292(b), and this court accepted the appeal. The case has been submitted to the original panel for decision without further oral argument.

Paul H. Lauber, Forrell & Long, God-frey, Ill., for debtors-appellants.

Clifford C. Emons, Schwarz, Self, Emons & McDonald, Jerseyville, Ill., for defendant-appellee.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

This case presents a conflict between a statute and its legislative history. The Sinclairs, who have a family farm, filed a bankruptcy petition in April 1985 under Chapter 11 of the Bankruptcy Act of 1978. In October 1986 Congress added Chapter 12, providing benefits for farmers, and the Sinclairs asked the bankruptcy court to convert their case from Chapter 11 to Chapter 12. The bankruptcy judge declined, and the district court affirmed. Each relied on § 302(c)(1) of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. 99–554, 100 Stat. 3088:

> The amendments made by subtitle B of title II shall not apply with respect to cases commenced under title 11 of the United States Code before the effective date of this Act.

The Sinclairs rely on the report of the Conference Committee, which inserted § 302(c)(1) into the bill:

> It is not intended that there be routine conversion of Chapter 11 and 13 cases, pending at the time of enactment, to Chapter 12. Instead, it is expected that courts will exercise their sound discretion in each case, in allowing conversions only where it is equitable to do so.

> Chief among the factors the court should consider is whether there is a substantial likelihood of successful reorganization under Chapter 12.

> Courts should also carefully scrutinize the actions already taken in pending cases in deciding whether, in their equitable discretion, to allow conversion. For example, the court may consider whether the petition was recently filed in another chapter with no further action taken. Such a case may warrant conversion to the new chapter. On the other hand, there may be cases where a reorganization plan has already been filed or confirmed. In cases where the parties have substantially relied on current law, availability [sic] to convert to the new chapter should be limited.

H.R.Conf.Rep. 99–958, 99th Cong., 2d Sess. 48–49 (1986), U.S.Code Cong. & Admin. News 1986, pp. 5227, 5249–5250. The statute says conversion is impossible; the report says that conversion is possible and describes the circumstances under which it should occur.

■ Which prevails in the event of conflict, the statute or its legislative history? The statute was enacted, the report just the staff's explanation. Congress votes on the text of the bill, and the President signed that text. Committee reports help courts understand the law, but this report contradicts rather than explains the text. So the statute must prevail. Such is the holding of *In re Erickson Partnership*, 856 F.2d 1068 (8th Cir.1988).

Yet the advice from the Supreme Court about how to deal with our situation seems scarcely more harmonious than the advice from the legislature. The reports teem with statements such as: "When we find the terms of a statute unambiguous, judicial inquiry is complete", *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). See also, e.g., *United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"); *Burlington*

*Northern R.R. v. Oklahoma Tax Commission,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987); *United States v. Locke,* 471 U.S. 84, 95–96, 105 S.Ct. 1785, 1792–93, 85 L.Ed.2d 64 (1985); *TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978); *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); *United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 83–84, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932); *Wisconsin R.R. Commission v. Chicago, Burlington & Quincy R.R.,* 257 U.S. 563, 588–89, 42 S.Ct. 232, 237–38, 66 L.Ed. 371 (1922); *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). Less frequently, yet with equal conviction, the Court writes: "When aid to the construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940) (footnotes omitted), repeated in *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). See also, e.g., *California Federal Savings & Loan Association v. Guerra,* 479 U.S. 272, 284, 107 S.Ct. 683, 691, 93 L.Ed.2d 613 (1987); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Some cases boldly stake out a middle ground, saying, for example: "only the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language." *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984). See also, e.g., *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981). This implies that once in a blue moon the legislative history trumps the statute (as opposed to affording a basis for its interpretation) but does not help locate such strange astronomical phenomena. These lines of cases have coexisted for a century, and many cases contain statements associated with two or even all three of them, not recognizing the tension.

What's a court to do? The answer lies in distinguishing among uses of legislative history. An unadorned "plain meaning" approach to interpretation supposes that words have meanings divorced from their contexts—linguistic, structural, functional, social, historical. Language is a process of communication that works only when authors and readers share a set of rules and meanings. *In re Erickson,* 815 F.2d 1090 (7th Cir.1987). What "clearly" means one thing to a reader unacquainted with the circumstances of the utterance—including social conventions prevailing at the time of drafting—may mean something else to a reader with a different background. Legislation speaks across the decades, during which legal institutions and linguistic conventions change. To decode words one must frequently reconstruct the legal and political culture of the drafters. Legislative history may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood. It may show, too, that words with a denotation "clear" to an outsider are terms of art, with an equally "clear" but different meaning to an insider. It may show too that the words leave gaps, for short phrases cannot address all human experience; understood in context, the words may leave to the executive and judicial branches the task of adding flesh to bones. These we take to be the points of cases such as *American Trucking* holding that judges may learn from the legislative history even when the text is "clear". Clarity depends on context, which legislative history may illuminate. The process is objective; the search is not for the contents of the authors' heads but for the rules of language they used.

Quite different is the claim that legislative intent is *the* basis of interpretation, that the text of the law is simply evidence of the real rule. In such a regimen legislative history is not a way to understand the

text but is a more authentic, because more proximate, expression of legislators' will. One may say in reply that legislative history is a poor guide to legislators' intent because it is written by the staff rather than by members of Congress, because it is often losers' history ("If you can't get your proposal into the bill, at least write the legislative history to make it look as if you'd prevailed"), because it becomes a crutch ("There's no need for us to vote on the amendment if we can write a little legislative history"), because it complicates the task of execution and obedience (neither judges nor those whose conduct is supposed to be influenced by the law can know what to do without delving into legislative recesses, a costly and uncertain process). Often there is so much legislative history that a court can manipulate the meaning of a law by choosing which snippets to emphasize and by putting hypothetical questions—questions to be answered by inferences from speeches rather than by reference to the text, so that great discretion devolves on the (judicial) questioner. Sponsors of opinion polls know that a small change in the text of a question can lead to large differences in the answer. Legislative history offers wilful judges an opportunity to pose questions and devise answers, with predictable divergence in results. These and related concerns have lead to skepticism about using legislative history to find legislative intent. E.g., *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 946–47, 67 L.Ed.2d 103 (1989) (Scalia, J., concurring); *Covalt v. Carey Canada Inc.,* 860 F.2d 1434, 1438–39 (7th Cir.1988); *Electrical Workers v. NLRB,* 814 F.2d 697, 712–15 (D.C.Cir.1987), and *id.* at 715–20 (Buckley, J., concurring); *FEC v. Rose,* 806 F.2d 1081, 1089–90 (D.C.Cir. 1986); *Wallace v. Christensen,* 802 F.2d 1539, 1559–60 (9th Cir.1986) (Kozinski, J., concurring); *Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C.Cir.1985) (Scalia, J., concurring). These cautionary notes are well taken, but even if none were salient there would still be a hurdle to the sort of argument pressed in our case.

Statutes are law, not evidence of law. References to "intent" in judicial opinions do not imply that legislators' motives and beliefs, as opposed to their public acts, establish the norms to which all others must conform. "Original meaning" rather than "intent" frequently captures the interpretive task more precisely, reminding us that it is the work of the political branches (the "meaning") rather than of the courts that matters, and that their work acquires its meaning when enacted ("originally"). Revisionist history may be revelatory; revisionist judging is simply unfaithful to the enterprise. Justice Holmes made the point when denouncing a claim that judges should give weight to the intent of a document's authors:

> [A statute] does not disclose one meaning conclusively according to the laws of language. Thereupon we ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used.... But the normal speaker of English is merely a special variety, a literary form, so to speak, of our old friend the prudent man. He is external to the particular writer, and a reference to him as the criterion is simply another instance of the externality of the law.... We do not inquire what the legislature meant; we ask only what the statute means.

Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 417–19 (1899), reprinted in *Collected Legal Papers* 204, 207 (1920). Or as Judge Friendly put things in a variation on Holmes's theme, a court must search for "what Congress meant by what it said, rather than for what it meant *simpliciter.*" Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes,* in *Benchmarks* 218–19 (1967). See also *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir.1986).

An opinion poll revealing the wishes of Congress would not translate to legal rules. Desires become rules only after clearing procedural hurdles, designed to encourage deliberation and expose proposals (and arguments) to public view and record-

ed vote. Resort to "intent" as a device to short-circuit these has no more force than the opinion poll—less, because the legislative history is written by the staff of a single committee and not subject to a vote or veto. The Constitution establishes a complex of procedures, including presidential approval (or support by two-thirds of each house). It would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some *evidence* about the law, while the *real* source of legal rules is the mental processes of legislators. We know from *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), that the express disapproval of one house of Congress cannot change the law, largely because it removes the President from the process; it would therefore be surprising if "intents" subject to neither vote nor veto could be sources of law.

If Congress enacts a parens patriae statute "intending" thereby to allow states to represent indirect purchasers of overpriced goods, that belief about the effects of the enactment does not become law. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 733–34 n. 14, 97 S.Ct. 2061, 2068–69 n. 14, 52 L.Ed.2d 707 (1977). If Congress were to reduce the rate of taxation on capital gains, "intending" that this stimulate economic growth and so yield more in tax revenue, the meaning of the law would be only that rates go down, not that revenue go up—a judge could not later rearrange rates to achieve the "intent" with respect to federal coffers. On the other hand, doubt about the meaning of a term found in the statute could well be resolved by harmonizing that provision with the structure of the rest of the law, understood in light of a contemporaneous explanation. In this sense legislative intent is a vital source of meaning even though it does not trump the text.

Concern about the source of law—is the statute law, or is it just evidence of the law?—lies behind statements such as: "[T]he language being plain, and not leading to absurd or wholly impracticable consequences, it is the sole evidence of the

ultimate legislative intent." *Caminetti,* 242 U.S. at 490, 37 S.Ct. at 196. To treat the text as conclusive evidence of law is to treat it *as* law—which under the constitutional structure it is. Legislative history then may help a court discover but may not change the original meaning. *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 2550–51, 101 L.Ed.2d 490 (1988). The "plain meaning" rule of *Caminetti* rests not on a silly belief that texts have timeless meanings divorced from their many contexts, not on the assumption that what is plain to one reader must be clear to any other (and identical to the plan of the writer), but on the constitutional allocation of powers. The political branches adopt texts through prescribed procedures; what ensues is the law. Legislative history may show the meaning of the texts—may show, indeed, that a text "plain" at first reading has a strikingly different meaning—but may not be used to show an "intent" at variance with the meaning of the text. *Caminetti* and *American Trucking* can comfortably coexist when so understood. This approach also supplies the underpinning for the belief that legislative history is "only admissible to solve doubt and not to create it", *Wisconsin R.R. Comm'n,* 257 U.S. at 589, 42 S.Ct. at 238, which punctuates the U.S. Reports. Legislative history helps us learn what Congress meant by what it said, but it is not a source of legal rules competing with those found in the U.S.Code.

■ Ours is now an easy case. Section 302(c)(1) of the statute has an ascertainable meaning, a meaning not absurd or inconsistent with the structure of the remaining provisions. It says that Chapter 11 cases pending on the date the law went into force may not be converted to Chapter 12. No legislative history suggests any other meaning. The committee report suggests, at best, a different intent. Perhaps a reader could infer that the committee planned to allow conversion but mistakenly voted for a different text. So two members of the committee have said since, calling § 302(c)(1) an oversight. See 133 Cong. Rec. S2273–76 (daily ed. Feb. 19, 1987)

(Sen. Grassley), E544 (daily ed. Feb. 19, 1987) (Rep. Coelho). Not only the committee's remarks on conversion but also the omission of § 302(c)(1) from the section-by-section description of the bill suggest that whoever wrote the report (a staffer, not a Member of Congress) wanted § 302(c)(1) deleted and may have thought that had been accomplished. Still another possibility is that the Conference Committee meant to distinguish Chapter 11 from Chapter 13: to ban conversions from Chapter 11 (covered by § 302(c)(1)) but allow them from Chapter 13. On this reading the gaffe is the failure to delete the reference to Chapter 11 from the report, which could still stand as a treatment of conversions from Chapter 13.

Congress has done nothing to change § 302(c)(1), implying that the statement in the committee report may have been the error. It is easy to imagine opposing forces arriving at the conference armed with their own texts and legislative histories, and in the scramble at the end of session one version slipping into the bill and the other into the report. Whichever was the blunder, we know which one was enacted. What came out of conference, what was voted for by House and Senate, what was signed by the President, says that pending Chapter 11 cases may not be converted. Accordingly, pending Chapter 11 cases may not be converted.

■ The debtors made an alternative request. They asked the bankruptcy judge to allow them to dismiss their Chapter 11 case and start a new one under Chapter 12. This would avoid the ban in § 302(c)(1). Ordinarily, however, a dismissal several years into a lawsuit is with prejudice to refiling. The Sinclairs do not want to dismiss the case with prejudice, pay all of their accrued debts, and then file a fresh bankruptcy action that could go forward from the date of refiling. They want, instead, to file a Chapter 12 case that would be administered as if it had been commenced in 1985. This is conversion by another name. Statutes control more than nomenclature; they are addressed to conduct. Proposals for conversion by another name are proposals for conversion. This one was properly rejected on the authority of § 302(c)(1).

AFFIRMED.