**BROADCAST MUSIC, INC., et al., Plaintiffs,**

v.

**CLAIRE'S BOUTIQUES, INC. d/b/a Claire's Boutiques and Arcadia, Defendant.**

No. 90 C 3881.

United States District Court, N.D. Illinois, E.D.

Dec. 28, 1990.

Robert G. Krupka, P.C., Nicole J. Klimisch, Kirkland & Ellis, Chicago, Ill., for plaintiff Broadcast Music, Inc.

Mark A. Orloff, Gail J. Berritt, Altheimer & Gray, Chicago, Andrew H. Bart, Lonnie Coleman, Pryor, Cashman, Sherman & Flynn, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

## I. INTRODUCTION

This case raises an issue concerning the scope of the "single receiving apparatus" exemption from the Copyright Act's grant to copyright owners of the exclusive right to publicly perform their works. It is brought by Broadcast Music, Inc. ("BMI"), which holds copyrights to musical compositions, against Claire's Boutiques, Inc. ("Claire's"), which owns and operates 749 retail stores. Pending are cross-motions for summary judgment. For the reasons described below, BMI's motion is denied and Claire's motion is granted.

**1.** Although the parties initially represented that the facts were not in dispute, their submissions in connection with the summary judgment motions raised a number of factual disputes. Pursuant to the Court's request, the parties then resolved their differences with respect to the essential facts and submitted a joint stipulation of material facts. The Court has relied primarily on that joint stipulation for its discussion of the facts.

## II. FACTS

The essential facts relevant to the pending motions are undisputed.[1] Claire's owns and operates 719 individual retail stores under the name Claire's Boutiques and 30 stores under the name Arcadia. The Claire's Boutiques stores sell women's accessories, and the Arcadia stores sell stationery, games, and novelty items.[2]

The Claire's Boutiques stores range in size from 458 square feet to 2000 square feet, with an average size of 861 square feet. Ninety-one of the stores are greater than 1055 square feet, and 628 are less than 1055 square feet. The Arcadia stores range in size from 748 square feet to 3300 square feet, with an average size of 2022 square feet. Twenty-seven of the stores are greater than 1055 square feet, and three are less than 1055 square feet.

During fiscal year 1990, Claire's had net sales of $168,674,000 and earned $13,402,-000 in net income. The Claire's Boutiques stores averaged $264,681 in net sales and $20,986 in net profits. The Arcadia stores, which Claire's acquired in October, 1989, averaged $126,381 in net sales and $15,870 in profits during the last quarter of fiscal year 1990, which included the Christmas season.

With the exception of approximately 65 stores,[3] Claire's stores receive radio broadcasts which are normally played in the stores during all hours they are open.[4] The equipment in each store includes a 5-watt stereo receiver, an indoor antenna, two speakers, and speaker wire. The same equipment is also used in Claire's warehouse, which is approximately 10,000 square feet in size.

The receiver used by Claire's is a Radio Shack Optimus STA-20 AM/FM receiver.

**2.** See Def. Ex. 19; Del Re Dep. at 206.

**3.** Those 65 stores opened after August 1990, and Claire's has decided not to play radio broadcasts in those stores pending the result of this litigation.

**4.** Because there are a number of stores in the Chicago area, it is likely that at least some play the same radio station simultaneously.

It does not have built-in speakers, and it has jacks that allow the connection of only two speakers. The speakers are Realistic Minimus 7 speakers, also sold by Radio Shack. They measure six inches by six inches by eight inches. They are designed to be set on a flat surface or hung from a wall or ceiling. Claire's utilizes 18–gauge speaker wire to connect the speakers to the receiver.[5] Claire's pays $103.96 for each receiver, $39.95 for each speaker, and $2.24 for each indoor antenna. These prices reflect volume discounts of 20 to 25 percent. The record does not indicate the amount Claire's spends on the speaker wire.

Altogether, Claire's owns and operates at least 669 receivers and 1,338 speakers. It orders 20 to 50 receivers per order and up to 300 speakers at a time. It maintains the equipment as a stock item, and a new receiver is shipped when a new store is built or when a receiver breaks and a new one is ordered from Claire's by the individual store. During the last four years, Claire's has spent a total of a little over $100,000 on stereo equipment.

The selling area in most stores is separated from a storage area by a partition wall. In those stores, the receiver is kept on a shelf in the storage area. In some stores, there is a closet rather than a storage area, and the receiver is kept on a shelf in the closet. In yet other stores, in which remodelling has not been completed, the receiver is kept behind the cash register counter. The parties have not contended that there is any material difference between the three arrangements, and have focused their attention on the first and most common arrangement.

The stores have decorative dropped ceilings with a grid composed of lights running just below the dropped ceiling. The speakers are attached to the upper ceiling, and they hang down to a point approximately six inches above the light grid. They are installed by general contractors when the stores are built.

A speaker wire runs from each of the receiver's two speaker jacks up the partition wall and through a hole in the partition wall. One wire is connected to a speaker which hangs from the ceiling in the rear corner of the selling area. This speaker is located at an average distance of five to fifteen feet from the receiver. The other wire runs above the dropped ceiling and is connected to a speaker which hangs from the ceiling at an average distance of twenty to thirty-five feet from the receiver. The speaker wire is concealed as much as possible.

BMI is a performing rights society recognized by the Copyright Act, 17 U.S.C. § 116(e)(3). It licenses public performance of copyrighted musical compositions, including about 50 percent of all compositions performed over the radio in this country.[6] For an annual fee, BMI offers a license to music users to perform the compositions in its repertoire.

Prior to their acquisition by Claire's, the Arcadia stores subscribed to a commercial background music service. Claire's discontinued the subscription approximately six months after the acquisition. Twenty-four Claire's Boutiques stores also had a trial subscription to a commercial background music service. Claire's ended the trial subscription because its employees preferred listening to the radio.

It is BMI's position that Claire's violates the Copyright Act by playing radio broadcasts in its stores because Claire's is not licensed by BMI. BMI has offered to provide Claire's with a license which would encompass all public performances of BMI music by Claire's at an annual cost of $240 for the first location and $45 to $65 for each additional location. The total cost of the license for all the stores involved in the pending motions would be $40,385, which

---

5. The instructions for the speakers provide: "Use speaker wire or ordinary 18–gauge SP–T lamp cord ('zip cord') for distances between amplifier and speaker of 50 feet (15 m) or less. Over 50 feet (15 m), use heavier 16–gauge wire." (Def. Ex. A.)

6. Anastas Aff. ¶ 4. Although Claire's disputes the relevance of this representation and does not concede its accuracy, it is undisputed that BMI licenses at least some of the music that has been played over the radio in Claire's stores.

amounts to an average of $53.92 per store. Claire's has offered to purchase a license encompassing all stores which have a size in excess of 1055 square feet, on the condition that BMI not seek to license the remaining stores. BMI has rejected this offer.

In this action, BMI and various artists who it represents have brought suit for copyright infringement based on specific songs which were broadcast into Claire's stores over the receiver and speakers owned by Claire's. The only dispute raised by the pending motions is whether Claire's is statutorily exempt from the licensing requirements of the Copyright Act pursuant to 17 U.S.C. § 110(5).[7]

## III.  ANALYSIS

### A.  Background

The Copyright Act gives a copyright holder certain exclusive rights in her copyrighted works. These include the exclusive rights of public performance of musical works. *See* 17 U.S.C. § 106.[8] Unlicensed performances which do not conflict with the exclusive rights granted by the Act do not infringe on the holder's rights. As the Supreme Court pointed out, "[n]o license is required by the Copyright Act, for example, to sing a copyrighted lyric in the shower." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 155, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975).

In *Aiken,* the Court was faced with the issue of whether the use of a radio in a fast-food establishment infringed on the exclusive rights of the owners of the copyrighted songs broadcast on the radio. The restaurant utilized a receiver with outlets to four speakers mounted in the ceiling. The Court noted that "the broadcast of a

copyrighted musical composition by a commercial radio station [is] a public performance of that composition for profit—and thus an infringement of the copyright if not licensed." 422 U.S. at 158, 95 S.Ct. at 2045. However, the Court's precedents indicated that one who listens to the broadcast through the use of a radio receiver does not perform the composition. *Id.* at 161, 95 S.Ct. at 2046, citing *Fortnightly Corp. v. United Artists,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. CBS,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). The Court then stated:

> To hold in this case that the respondent Aiken "performed" the petitioners' copyrighted works would thus require us to overrule two very recent decisions of this Court. But such a holding would more than offend the principles of *stare decisis;* it would result in a regime of copyright law that would be both wholly unenforceable and highly inequitable.

*Id.* 422 U.S. at 162, 95 S.Ct. at 2046–47. The Court stated that such a holding would be unenforceable because of the large number of business establishments with radio or television sets, and inequitable because it would authorize "the sale of an untold number of licenses for what is basically a single public rendition of a copyrighted work." *Id.* at 162–63, 95 S.Ct. at 2047.

In 1976, Congress created an explicit exemption modelled after the Supreme Court's holding in *Aiken.* This exemption provides:

> [C]ommunication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private

---

7.  Claire's has raised additional affirmative defenses and has filed a counterclaim, which BMI has moved to strike. The parties agreed that briefing of all other motions should be stayed pending the resolution of the pending motions for summary judgment. BMI's motion for summary judgment relates only to liability for copyright infringement, and it does not address affirmative defenses or the counterclaim. Claire's motion for summary judgment raises only the § 110(5) exemption.

8.  17 U.S.C. § 106 provides, in part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: ...

(4) in the case of literary, musical, dramatic, or choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

. . . .

homes [does not constitute a copyright infringement], unless—

(A) a direct charge is made to see or hear the transmission; or

(B) the transmission thus received is further transmitted to the public.

17 U.S.C. § 110(5).[9] This provision is discussed in the Report of the House Committee on the Judiciary:

[I]ts purpose is to exempt from copyright liability anyone who merely turns on, in a public place, an ordinary radio or television receiving apparatus of a kind commonly sold to members of the public for private use.

The basic rationale of this clause is that the secondary use of the transmission by turning on an ordinary receiver in public is so remote and minimal that no further liability should be imposed....

It is the intent of the conferees that a small commercial establishment of the type involved in [*Aiken*], which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt. However, where the public communication was by means of something other than a home-type receiving apparatus, or where the establishment actually makes a further transmission to the public, the exemption would not apply....

Under the particular fact situation in the Aiken case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt under clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemption, and believes that the line should be drawn at that point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial "sound system" installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system. Factors to consider would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the aural or visual quality of the performance for individual members of the public using those areas.

H.R.Rep. No. 94–1476, 94th Cong.2d Sess. 86, 87 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5700, 5701 and 17 U.S.C.A. pp. 145, 148–149 (1977).

At issue in this case is whether Claire's falls within the § 110(5) exemption. The burden of proof lies on Claire's to show that it falls within the exemption. *See BMI v. Hartmarx*, No. 88 C 2856, 1989 WL 121290 (N.D.Ill. Oct. 5, 1989). BMI does not contend that Claire's makes a direct charge to see or hear the radio broadcasts, *see* 17 U.S.C. § 110(5)(A). Accordingly, the statute provides three elements which Claire's must prove to establish that the exemption applies: (1) it uses a single receiving apparatus; (2) the receiving apparatus is of a kind commonly used in private homes; and (3) Claire's does not further transmit to the public the transmissions it receives. A central issue in this case, apparently one of first impression, is whether this analysis should focus on each individual store or on the corporation as a whole. If the individual stores would not be exempt, it is unnecessary to consider this larger issue. Accordingly, the Court shall first examine the application of the statute to the individual stores.

---

**9.** Although this provision supported the *Aiken* result, it changed the rationale; in contrast to the Supreme Court's conclusion that no "performance" had occurred, under the new statute a performance does occur but does not require a license. *See* 2 Nimmer on Copyright § 8.18[B] (1990).

## B. Individual Stores

### 1. Single Receiving Apparatus

There is no dispute that each store, considered individually, operates only one radio receiver. Accordingly, the first element of the exemption is satisfied.

### 2. Kind Commonly Used in Private Homes

■ A number of courts have examined various models and configurations of receivers and speakers in order to determine whether the sound systems are of a kind commonly used in private homes. Although by its terms the statute requires only that the "receiving apparatus" be of a kind used in private homes, courts have examined the entire sound systems, including the speakers and speaker wiring, in making this determination. *See, e.g., Hickory Grove Music v. Andrews*, 749 F.Supp. 1031 (D.Mont.1990) ("courts must examine the entire system and the context of its use, rather than focusing on individual components"). The factors which courts generally examine include (1) whether the receiver and other equipment itself is generally sold for commercial or private use; (2) the number of speakers which the receiver can accommodate; (3) the number of speakers actually used; (4) the manner in which the speakers are installed; (5) whether the speaker wires are concealed; (6) the distance of the speakers from the receiver; and (7) whether the receiver is integrated with a public announcement system or telephone lines.[10] Although courts have not generally clarified the relative weight or the relationship of these various factors, this Court finds such a discussion to be necessary.

BMI argues that the systems in this case contain certain features which are similar to those in cases where the systems have been found not to be of a type commonly used in private homes, and BMI emphasizes Claire's use of ceiling speakers and concealed wiring. Claire's responds that its equipment is less sophisticated than that in the vast majority of the cases relied on

---

**10.** *See National Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726, 731 (8th Cir.1986) (system not home-type where it used satellite dish to receive signals); *Hickory Grove*, 749 F.Supp. at 1038 (system not home-type where receiver was connected by concealed wiring to five recessed ceiling speakers at a distance of up to 45 feet and where speakers were originally installed to support public address system); *Broadcast Music, Inc. v. Jeep Sales & Service Co.*, 747 F.Supp. 1190, 1193 (E.D.Va.1990) (system not home-type where it included four recessed ceiling speakers and four public address horns mounted on light poles); *Crabshaw Music v. K–Bob's of El Paso, Inc.*, 744 F.Supp. 763, 767 (W.D.Tex.1990) (system not home-type where it included a commercial type tuner wired into a public address system, commercial quality microphones, and eleven commercial speakers installed throughout restaurant); *Gnossos Music v. DiPompo*, 1989 Copyright L.Dec. (CCH) ¶ 26,483, 13 USPQ2d (BNA) 1539, 1989 WL 154358 (D.Me.1989) (system not home-type where it consisted of portable radio/cassette player in restaurant lobby, connected by concealed wiring to eight to ten recessed commercial-quality speakers in dining rooms and lobby); *Merrill v. Bill Miller's Bar–B-Q Enterprises, Inc.*, 688 F.Supp. 1172, 1175 (W.D.Tex.1988) (system not home-type, even though individual components were home-type, where receiver was connected by 40 feet of hidden wiring to eight unfinished, ceiling mounted speakers spaced 30 feet apart); *Merrill v. County Stores, Inc.*, 669 F.Supp. 1164, 1170 (D.N.H.1987) (system was not home-type where it could be interrupted for paging purposes, it was integrated into telephone network, and it included 14 or 15 recessed ceiling speakers covering 13,000 square feet of floor area); *International Korwin Corp. v. Kowalczyk*, 665 F.Supp. 652, 655, 657 (N.D.Ill.1987) (system not home-type where receiver had paging capabilities, three sets of speaker terminals, and capacity for driving 40 speakers, and was attached to eight remote ceiling speakers with concealed wiring), *aff'd*, 855 F.2d 375 (7th Cir.1988); *Rodgers v. Eighty Four Lumber Co.*, 617 F.Supp. 1021, 1023 (W.D.Pa.1985) (system not home-type where separate receiver and amplifier were used, where system contained public address system, where there were 2 to 5 speakers inside the store and 1 to 3 speakers outside the store, and where most speakers were located 150 feet from the receiver); *Springsteen v. Plaza Roller Dome, Inc.*, 602 F.Supp. 1113, 1118 (M.D.N.C.1985) (system not commercial, even though receiver was wired to six speakers mounted on light poles over 7500 square foot area of miniature golf course, because of inferior noise level and audibility); *Lamminations Music v. P & X Markets, Inc.*, 1985 Copyright L.Dec. (CCH) ¶ 25,790, 1985 WL 17704 (N.D.Cal.1985) (system not home-type where it included "receiving equipment and [six to ten] ceiling-mounted speakers akin to a commercial background music system" and speakers were "not arranged within a narrow circumference from the receivers").

by BMI. Both of the parties' arguments are correct, but neither is determinative. In order to resolve this issue, the Court shall look in turn at each of the factors enumerated above.

*1. The equipment itself.* The Court finds that the components themselves are of a type commonly used in private homes. The receiver delivers only 5 watts of power, far less than many receivers sold for private use. It sells for a price lower than many receivers sold for private use. Even a cursory review of newspaper advertisements reveals many more sophisticated receivers designed for home use. Similarly, the speakers are small and are clearly designed for private home use, and the speaker wire is the type recommended by the speakers' manual.

*2. Number of speakers receiver can accommodate.* The receiver in this case contains jacks for only two speakers.[11] Home-type receivers typically accommodate two or four speakers. In this respect, the receivers used by Claire's stores are home-type receivers.

*3. Number of speakers used.* Two speakers are in fact used in each store, and this factor weighs in favor of finding that it is a home-type system. Indeed, the legislative history indicates that a system which includes four speakers may qualify for this exemption.[12]

*4. Manner in which speakers are installed.* The speakers in this case are concealed in a dropped ceiling. Many courts have treated ceiling-mounted speakers as indicative that a system is home-type. This court agrees that the use of ceiling-mounted speakers weighs against application of the exemption, but it cautions that this factor is not determinative. Where all other factors point to a home-style system, the fact that one hangs the speakers from a

ceiling rather than setting them on the floor or shelf or mounting them on a wall should not change the result. First, it is not difficult to mount speakers in a ceiling, and private consumers increasingly utilize sophisticated home entertainment arrangements, including speakers recessed in a wall or ceiling. Second, where all other factors point in favor of a finding that the system is home-type, making the result change if the business installs the speakers in a ceiling can hardly fulfill the intent of Congress. If, as BMI states, Congress intended to protect small commercial establishments, making the copyright exemption turn on the use of ceiling-mounted speakers would be an odd choice for a yardstick.[13]

*5. Use of concealed wiring.* This factor is closely related to the use of ceiling-mounted speakers, and the analysis is similar. In virtually all of the precedents, the use of concealed wiring has been noted where the speakers were mounted in the ceiling. The Court again finds that this factor is somewhat relevant but not determinative. As Claire's points out, it is rather naive to suggest that speaker wires in private homes are generally short and exposed. Concealing the speaker wires—as well as recessing the speakers in a ceiling—serves more of an aesthetic purpose and has little relevance to the sophistication of the sound system.

*6. Distance of speakers.* In cases involving ceiling-mounted speakers attached by concealed wiring, courts have often noted the distance of the speakers from the receiver.[14] The Court finds that this factor should be considered but is relatively insignificant. Congress did intend to exempt small business establishments,[15] and it could be argued that if the distance be-

---

**11.** BMI's assertion that the receiver can drive any number of speakers—an assertion that does not resurface in the joint stipulated facts—is contradicted by the receiver itself and the owner's manual, both of which have been submitted as exhibits.

**12.** *See* H.R.Rep. No. 94–1476, *supra* at 1327–1328.

**13.** Thus in *Aiken,* the result of which Congress intended to preserve, the store utilized four ceiling-mounted speakers.

**14.** The House report noted that in *Aiken,* the speakers were located within a relatively small circumference. *See supra* at 1328.

**15.** *See supra* at 1327–1328.

tween the receivers and the speakers is large, the business is not likely to be the type of small establishment Congress had in mind. However, this factor is addressed by the other factors relevant to the home-type analysis; home-type components are unlikely to suffice to provide sound for a large commercial establishment. Furthermore, the area covered by a home-type sound system is not likely to be significantly affected simply by placing the speakers at a large distance from the receiver—speakers do not become louder simply by being placed further from the receiver. Finally, the Court takes judicial notice that many speakers are sold to private consumers for the express purpose of listening to the radio in a room other than that in which the receiver is located.

In this case, the speakers are located up to 15 and 35 feet from the receiver. The Court finds this to be within the range of equipment commonly used in private homes.

*7. Integration with other systems.* The receivers used by Claire's are not integrated with public address systems or telephone lines. They play only unaltered radio broadcasts. Accordingly, this factor weighs in favor of Claire's.

To summarize, all of the factors weigh in favor of Claire's with the exception of the use of concealed wiring and ceiling-mounted speakers. As noted above, the Court does not view these two factors as sufficient in themselves to change the result. Much more significant are the nature of the components themselves and any funda-

mental modifications to the equipment which alter the very nature of the performance. The Court finds that the Claire's stores, examined on an individual basis, use a sound system of a type commonly used in private homes.

### 3. Further Transmission

■ The Court next examines whether the transmissions received by each Claire's store are further transmitted to the public.[16] There are two related theories pursuant to which Claire's may be considered to engage in a further transmission of the radio broadcasts it receives: first, that further transmission occurs whenever the broadcast is relayed from a receiver to external speakers through speaker wire; and second, that further transmission occurs when the speakers are not located in the same room as the receiver.

Although there is some support for each of these theories in the case law,[17] the Court cannot accept either of them. First, to read "further transmission" as including the mere transmission over the speaker wires themselves is to read this element right out of the statute. Every radio requires wiring—whether external or internal—to reach the speakers which make the sound. To describe this as a further transmission means that every sound system utilizes a further transmission.[18] If Congress had intended this result, it would not have created the § 110(5) exemption in the first place. Furthermore, the store in *Aiken,* which Congress intended to be encom-

---

**16.** The Copyright Act defines "transmit" as follows: "to 'transmit' a performance ... is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. Although the Act does not define "further transmission," it does define "secondary transmission" as "the further transmitting of a primary transmission simultaneously with the primary transmission...." 17 U.S.C. § 111(f).

**17.** *See Hickory Grove,* 749 F.Supp. at 1038 (further transmission occurred where radio broadcasts were sent to other rooms, public could hear them, and music was recognizable); *Gnossos,* 1989 Copyright L.Dec. ¶ 26,483 (further transmission occurred where radio broadcasts were sent to separate rooms); *Bill Miller's,* 688

F.Supp. at 1176 ("the radio broadcasts ... were 'further transmitted' to the public because the broadcasts were initially received in a room or area without speakers and were sent to a separate room with speakers via some 40 feet of wiring"); *Kowalczyk,* 665 F.Supp. at 657 (use of speakers in separate rooms constituted further transmission); *Lamminations,* 1985 Copyright L.Dec. ¶ 25,790 ("By the very nature of the radio-over-loudspeaker installations, the performances of plaintiffs' songs were 'further transmitted' from the receivers to the loudspeakers.").

**18.** This would also imply that the original transmissions can never be heard, because they would consist merely of the radio waves before they are made audible.

passed by the exemption, involved the use of speaker wires to reach concealed ceiling speakers.

Second, it would be arbitrary and pointless to make resolution of this element dependent on the length of the speaker wire involved. The length of the wire does not alter the nature of the transmission. A system which utilizes excessive lengths of speaker wire is likely to include other features which make it not the type of system commonly used in private homes; the "further transmission" element should not be distorted to substitute for the home-type equipment element.

Third, the mere fact that the speaker wire is run through or around a wall does not alter the type of transmission. Again, the use of speaker wire either is or is not a further transmission; the analysis of this element should not depend on the manner in which the wire is routed, just as it should not depend on the wire's length. Perhaps if the receiver feeds a number of speakers, each of which is in a different room, the exemption should not apply—although again, that configuration seems more appropriately addressed in terms of the home-type element. Under BMI's logic, however, a system which is otherwise exempt would become non-exempt merely if the receiver were placed in a closet and the other aspects of the system remained

the same. Congress cannot have intended the application of the exemption to turn on such an insignificant distinction. Furthermore, as noted above, speakers are often sold for private use in rooms separate from receivers. Surely Congress did not intend that such a private system would come within its idea of "further transmission."

In view of the nature and purpose of the exemption, "further transmission" can only mean something more substantial, such as a re-broadcast of a transmission or the use of cable to service multiple receivers. It cannot encompass the mere use of the speaker wire which enables a home-type receiver to drive its speakers.

### 4. Size of Establishment

■ The three factors discussed above exhaust the elements listed in the statute. However, a number of courts have proceeded—without considering the appropriateness of this endeavor—to draw additional elements from the legislative history. They have thus examined the size of the business itself, looking to such factors as the physical size of the area covered by the performance, the number of customers served, and the revenues.[19] These factors stem from the House Report's statements that the exemption is intended to apply to "small commercial establishments" which may not be large enough to "justify ... a

---

**19.** *See Sailor Music v. Gap Stores, Inc.,* 668 F.2d 84, 86 (2d Cir.1981) (store with area of 2769 square feet was of sufficient size to justify subscription to commercial music service and therefore not exempt), *cert. denied,* 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Hickory Grove,* 749 F.Supp. at 1038–39 (only small commercial establishments qualify; relevant are square footage, capacity, and revenues; 880 square feet open to public is too large); *Gnossos,* 1989 Copyright L.Dec. ¶ 26,483 (not small commercial establishment where 1,824 square feet was open to public and dining rooms accommodated 172 people); *Crabshaw,* 744 F.Supp. at 767 (in finding store not exempt, court noted size was 7000 square feet and gross annual revenues were $800,000 and $900,000); *Bill Miller's,* 688 F.Supp. at 1176 (chain of restaurants not exempt where each restaurant covered 1000 to 1500 square feet and grossed over $500,000 annually and where restaurants had previously subscribed to music service); *County Stores,* 669 F.Supp. at 1170 (store not exempt where annual sales were $2.5 million and size

was 13,000 square feet); *Rodgers,* 617 F.Supp. at 1023 (stores with public areas in excess of 10,000 square feet not exempt); *Springsteen,* 602 F.Supp. at 1119 (miniature golf course which covered 7500 square feet was not of sufficient size to justify subscription to music service where it was open only six months per year and rarely generated revenues over $1000 per month); *Lamminations,* 1985 Copyright L.Dec. ¶ 25,790 (businesses were of sufficient size to warrant use of commercial background music system where they covered 10,000 to 14,500 square feet and where two of them already used such services). *See also Kowalczyk,* 665 F.Supp. at 655, 658 (business was not small commercial establishment where it covered 2,640 square feet and had annual net profits of $35,000 to $136,000). (*Kowalczyk* was affirmed by the Seventh Circuit, which summarized the district court's opinion but did not rule on the appropriate elements to be considered. *International Korwin Corp. v. Kowalczyk,* 855 F.2d 375, 378 (7th Cir.1988).)

subscription to a commercial background music service," that the *Aiken* facts represent the "outer limit," and that the "size, physical arrangement, and noise level" of the establishment are relevant.[20] Both parties agree in this case that the Court should look beyond the face of the statute to the factors noted in the House Report, but they disagree as to precisely which factors apply and how they are relevant. BMI focuses on the revenues and profits of the stores, and Claire's focuses on their physical size.

The Court must first address whether factors other than those specified in the statute should be considered at all. Although precedents concerning principles of statutory interpretation often send confusing signals, the Seventh Circuit in *Matter of Sinclair*, 870 F.2d 1340 (7th Cir.1989), has provided a thorough and sensible guide to the question of when a court may look to factors beyond the text of a statute in interpreting that statute. The court in that case resolved the superficial inconsistency between two common maxims of statutory interpretation: that courts should not look to legislative history to interpret an unambiguous statute, and that statutes should be interpreted in order to best effectuate their intent. As the court in *Sinclair* explained, the latter principle allows courts to examine even apparently unambiguous statutes in light of their legislative history in order to decode the terms used in the statute—to determine whether the words used had a different meaning to an insider than they do to the general public, or that the words have gaps which leave elaboration to the executive and judicial branches. 870 F.2d at 1342. However, although the legislative history may thus help a court discover the statute's meaning, it may not be used to change it. *Id.* at 1344.

> Legislative history may show the meaning of the texts—may show, indeed, that a text 'plain' at first reading has a strikingly different meaning—but may not be used to show an 'intent' at variance with the meaning of the text.... Legislative history helps us learn what Congress meant by what it said, but it is not a source of legal rules competing with those found in the U.S. Code.

*Id.*

In this case, to examine statistics concerning square footage or revenues and elevate them to an importance equal or even greater than the factors enumerated in the text of § 110(5) itself is to violate this principle, drawing on legislative history to formulate "rules competing with those found in the U.S. Code." The text of the § 110(5) includes nothing at all about the size of a business, the area that it covers, or the revenue that it generates. Certainly the legislative history may be useful in terms of interpreting such factors as "further transmission" and "single receiving apparatus of a kind commonly used in private homes." It may not, however, be used to supply additional elements beyond those specified in the statute.

It certainly is apparent from the legislative history that Congress' intent in enacting § 110(5) was to exempt small commercial establishments. It is equally clear from the text of § 110(5) that Congress chose to effectuate this intent by drawing a distinction based on the type of sound equipment utilized and the nature of the transmission. It did not choose to protect small businesses by drawing distinctions based on square footage or revenues. Furthermore, it is hardly irrational for Congress to determine that its intent could indeed be realized by the manner it adopted; Congress could reasonably believe that only small commercial establishments would be able to make effective use of a single home-type receiving apparatus, and that the elements it specified would preclude larger establishments from benefitting from the exemption.[21]

---

**20.** *See supra* at 1327–1328.

**21.** Even if the statute did not in practice fulfill Congress' intent, that would not provide a basis for enforcing the intent rather than the text. As Judge Easterbrook wrote in *Sinclair:*

> If Congress were to reduce the rate of taxation on capital gains, "intending" that this stimulate economic growth and so yield more in tax revenue, the meaning of the law would be only that rates go down, not that revenue go up—a judge could not later rearrange rates

Claire's has suggested that the square footage of individual stores is of paramount importance. It notes that the store in *Aiken*, which Congress described as the "outer limit," had a total of 1055 square feet and selling space of 620 square feet, and urges that any store smaller than that should be exempt. Claire's has also offered to license those stores larger than the one in *Aiken* if BMI would not seek to license the remaining stores.[22] As noted above, a number of courts have found the physical size of an establishment relevant, and some have even relied on it exclusively. To do so, however, is to bring into the analysis an element of arbitrariness which Congress did not include in the statute and which the Court cannot believe Congress ever intended to adopt. Surely Congress would not have wanted the exemption determined by a matter of a few square feet, and it chose more relevant criteria concerning the nature of the sound system. It is rather pedestrian to suggest that in describing *Aiken* as the outer limit, Congress could only have thought in terms of square feet. In fact, the Supreme Court in *Aiken* never even stated the physical size of the restaurant, and the size is not specified in the House Report, much less in the statute itself. The Court finds that the square feet covered by an establishment is, at best, a very minor factor in determining the applicability of the exemption.[23]

The Court finds an examination of a store's revenues and profits to be of minimal importance for the same reasons. Neither the Supreme Court nor Congress specified the amount of revenues or profits

achieved by the restaurant in *Aiken*. Congress could easily have drawn a distinction based on financial criteria, and it chose to write no such distinction into the statute. Rather, it chose another manner to control the size of the establishments entitled to the exemption, and that was to rely on the type of equipment and transmission utilized.

It is equally unhelpful to discuss as a separate factor whether a business is capable of subscribing to a commercial background music service. Congress has already chosen a method for making this determination, and that method is specified in § 110(5). If courts were to look beyond the text, and place determinative emphasis on whether a given establishment could afford a commercial service, then the exemption would effectively disappear. Licensing organizations and background music providers could simply choose to extend to every small business a low enough rate to remove them from the exemption.[24]

As the statute stands, it provides no basis for concluding that the exemption is to be applied according to the size and profitability of a business. If BMI or other licensors desire another result, their remedy lies with Congress itself, which has the power to rest the exemption on such factors but has not done so.

### 5. Summary

■ The Court finds that the stores in this case, considered individually, qualify for the exemption in § 110(5). Each store uses a single receiver; each store uses

---

to achieve the "intent" with respect to federal coffers.
870 F.2d at 1344.

22. The Court finds no indication that, as BMI suggests, Claire's has actually conceded that those stores larger than that in *Aiken* do not qualify for the exemption.

23. Consider two distinct hypothetical establishments which utilize the basic equipment involved in this case. One, an ice cream parlor smaller in size than the restaurant in *Aiken*, has the stereo equipment prominently displayed and played at a high volume, easily audible throughout the entire seating area. The other is a cafe, much larger than the restaurant in *Aiken*, which has the stereo equipment set on a small table in

a back corner, facing toward the seating area. Other factors being the same, surely Congress cannot have intended these establishments to be treated differently, and if Congress did so intend, surely it would have included physical size as an express factor in the text of the statute.

24. If a business's revenues or ability to afford a commercial background service were of predominant importance, a large conglomerate corporation which merely placed a portable radio in a small snack shop would presumably not be exempt. Again, in light of the language of § 110(5), it is apparent that Congress did not intend such a result.

equipment of a type commonly found in private homes, and no store engages in further transmission of the broadcasts it receives. The fact that some of the stores may be slightly larger than 1055 square feet or take in more revenue or profits than did the restaurant in *Aiken* does not remove them from the scope of the exemption.

## C. Chain as a Whole

■ Having determined that the stores considered individually qualify for the exemption, the Court turns to the issue of whether the chain of stores should be examined in its entirety. If the chain must be examined as a whole, it apparently is not exempt. It operates more than a single receiver—it operates at least 669—and would thus fail to satisfy the first criterion. Furthermore, a sound system of 669 speakers and 1338 speakers is not the type of system commonly found in private homes, so the chain would not satisfy the second criterion.

In support of its argument that the analysis should focus on the chain as a whole, BMI states that only one license is necessary to cover all of the stores. BMI would base the license fee, however, on the number of stores which play radio broadcasts. Furthermore, the manner in which BMI elects to structure its license agreements should not affect the scope of the exemption; the single license is not inherent in the nature of the performance but rather is determined by BMI. The exemption depends not on the type of license agreement involved, but rather on the equipment used by the allegedly infringing store.

BMI also argues that the Copyright Act defines "publicly" performing a work as being unaffected by whether "the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. This definition makes it clear that

the mere fact that the Claire's stores perform radio broadcasts in a number of different places does not preclude the performance from being public.[25] It does not, however, provide guidance in determining whether the entire chain is the appropriate focus for a § 110(5) inquiry.

Although this precise issue has apparently not been litigated before, there are a number of cases in which courts have examined the applicability of § 110(5) to stores which were members of chains. In each of those instances, the court has centered its analysis primarily, if not exclusively, on the individual store or stores rather than on the chain as a whole. *See Sailor Music*, 668 F.2d at 85–86 (focusing on size of individual store); *Bill Miller's*, 688 F.Supp. at 1174–76 (examining type of components used by each store and size and revenues of each store, and noting also the revenues of the entire chain); *Rodgers*, 617 F.Supp. at 1023 (focusing on size of, and type of components used by, each store); *Lamminations*, 1985 Copyright L.Dec. ¶ 25,790 (focusing on size of each store and type of components used by each store).

An examination of the text of § 110(5) provides little guidance—it defines the exemption in terms of the nature of the performance rather than the nature of the business. Although the statute does specify the elements which are relevant in determining whether a performance is exempt, it does not specify what entity should be examined—an individual store or its corporate owner. Thus, unlike the issue of the relevant elements of the exemption, it is appropriate to examine the legislative history for guidance as to whether the chain as a whole should be considered. Most helpful is the statement in the House Report that Congress intended to reaffirm that the exemption would apply to *Aiken*. In *Aiken*, the store involved was part of a chain. *Twentieth Century Music Corp. v. Aiken*, 356 F.Supp. 271, 272 (W.D.Pa.1973). If the *Aiken* case were to arise under cur-

25. *See, e.g., Buck v. Jewell–LaSalle Realty Co.,* 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931) (hotel transmission of radio broadcasts to speakers in individual guests' rooms was a performance within the scope of the Copyright Act).

rent law, and if the court were to analyze the chain as a whole, the chain would not be exempt because it does not use a single receiving apparatus of a kind commonly used in private homes. Indeed, if chains are to be examined as a whole, no chain in which more than one store utilized a radio receiver would be exempt. Congress cannot have intended this result if it also intended to reaffirm the result in *Aiken*. The Court can only conclude, therefore, that Congress intended the exemption to be analyzed in terms of individual stores.[26] Again, BMI's arguments to the contrary are best directed toward Congress itself.

## IV. CONCLUSION

The Claire's stores must be considered on an individual basis rather than in the aggregate. Because each store operates only a single receiving apparatus of a type commonly used in private homes, and does not further transmit the radio broadcasts it receives, the stores are exempt from liability for copyright infringement pursuant to 17 U.S.C. § 110(5).

**26.** BMI might argue that because the Court has determined that legislative history is relevant on this issue, the Court should rely on the House Report's reference to the size of the business and hold that the chain as a whole must be examined. The Court cannot accept this argument. In order to give effect to Congress' intent to affirm the result in *Aiken*, the only way in which courts could apply § 110(5) to chain stores would be to draw arbitrary lines based, for instance, on the number of stores in the chain. Such an exercise is not appropriate for the judiciary, and there is no indication that Congress intended to create such an exercise for the courts. If Congress had intended such lines to be drawn, it could easily have drawn them.

Furthermore, there is no inherent difference in the nature of the performance if 10 individually-owned stores, which all play an otherwise exempt radio broadcast, subsequently are combined in a chain. Of course, if the receivers operated collectively—for instance if Claire's received a radio broadcast at a central location and then re-transmitted it to the various individual stores—then the exemption would presumably not apply. However, in order to deny the exemption in that case, there would be no need to rule that the focus should shift to the chain as a whole; the text of § 110(5) would itself apply to deny the exemption, for there would be a "further transmission."